UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **INFORMATION** |
| v. | 24 Cr. |
| TELEFÓNICA VENEZOLANA, C.A., | |
| Defendant. | |

The United States charges:

## GENERAL ALLEGATIONS

### Relevant Statutory Background

1.  The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing any business to, any person.

### TELEFÓNICA VENEZOLANA and Relevant Entities and Individuals

2.  From in or around 2014 to in or around 2015 (the "Relevant Period"), TELEFÓNICA VENEZOLANA, C.A. ("TELEFÓNICA VENEZOLANA"), the defendant, was a telecommunications operator headquartered in Caracas, Venezuela, that provided mobile phone services in Venezuela. During the Relevant Period, through multiple holding companies, TELEFÓNICA VENEZOLANA was a wholly owned subsidiary of Telefónica, S.A. ("Telefónica"), a global telecommunications operator headquartered in Madrid, Spain. Since in or around 1987, Telefónica has traded its American Depositary Receipts ("ADRs") on the New York

Stock Exchange. Telefónica is therefore an "issuer," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(a).

3. During the Relevant Period, Telefónica controlled, oversaw, and managed TELEFÓNICA VENEZOLANA, the defendant, including the selection and employment of its senior officers. As such, TELEFÓNICA VENEZOLANA was an "agent" of Telefónica in Venezuela, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4. "Executive-1," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, served as a senior executive of TELEFÓNICA VENEZOLANA, at the control and direction of Telefónica, during the Relevant Period. Executive-1 was therefore an "agent" of Telefónica, in Venezuela, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

5. "Company-A," is the wholly owned Venezuelan subsidiary of a multinational telecommunications equipment and systems company, whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant. During the Relevant Period, Company-A was one of TELEFÓNICA VENEZOLANA's main suppliers of telecommunications infrastructure components and related equipment.

6. "Company-A Executive," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, had senior managerial responsibility for Company-A during the Relevant Period.

7. "Company-A Employee," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, served as an account manager for Company-A during the Relevant Period.

8. "Company-B," is the wholly owned Venezuelan subsidiary of another multinational telecommunications equipment and systems company, whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant. During the Relevant Period, Company-B was one of TELEFÓNICA VENEZOLANA's main suppliers of telecommunications infrastructure components and related equipment.

9. "Company-B Employee," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, was an employee of Company-B. Company-B Employee served as an account manager for Company-B during the Relevant Period.

10. "Company-C," is the United Arab Emirates-based subsidiary of a technology import-export company, whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant. Company-B designated Company-C as Company-B's "integrator" for a series of sales from Company-B to TELEFÓNICA VENEZOLANA during the Relevant Period. As the purported "integrator," Company-C was responsible for configuring the hardware and software that Company-B sold for use in TELEFÓNICA VENEZOLANA's telecommunications network, to ensure that all components worked together.

**Foreign Government Entities and Officials**

11. "Foreign Official-1," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, is a Venezuelan national who served as a high-ranking Venezuelan government official during the Relevant Period. Foreign Official-1 was therefore a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

12. "Foreign Official-2," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, is a Venezuelan national who served as a high-

ranking Venezuelan government official during the Relevant Period. Foreign Official-2 was therefore a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

### Third Party Agents and Consultants

13. "Intermediary-1," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, is a Venezuelan national who solicited and received bribe payments from TELEFÓNICA VENEZOLANA during the Relevant Period on behalf of, among others, Foreign Official-1 and Foreign Official-2.

14. "Shell Company-1," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, was a shell company incorporated in Panama that was owned and controlled by Intermediary-1 during the Relevant Period and was used, at least in part, for the benefit of Venezuelan government officials, including Foreign Official-1.

15. "Intermediary-2," whose identity is known to the United States and TELEFÓNICA VENEZOLANA, the defendant, is a Venezuelan national and a relative of Intermediary-1. During the Relevant Period, Intermediary-2 assisted Intermediary-1 in providing things of value to Foreign Official-1 and others.

### Overview of the Bribery Scheme

16. During the Relevant Period, TELEFÓNICA VENEZOLANA, the defendant, through certain of its officers, employees, and agents, and while acting as an agent of Telefónica, together with its co-conspirators, knowingly and willfully conspired and agreed with others to corruptly provide payments to, and for the benefit of, foreign officials in Venezuela, including Foreign Official-1 and Foreign Official-2, to secure an improper advantage and to influence those foreign officials in order to obtain and retain business by receiving preferential access to U.S.

dollars in a government-sponsored currency auction that allowed TELEFÓNICA VENEZOLANA to purchase equipment for its telecommunications network.

17.     Specifically, in or around 2014, TELEFÓNICA VENEZOLANA, the defendant, participated in a currency auction in Venezuela that allowed TELEFÓNICA VENEZOLANA to exchange its Venezuelan bolívars for U.S. dollars. To ensure its success in the auction, TELEFÓNICA VENEZOLANA recruited two suppliers, Company-A and Company-B, to make approximately $28,870,099 in corrupt payments to Intermediary-1 and Shell Company-1 that were intended, at least in part, to benefit Venezuelan government officials, including Foreign Official-1 and Foreign Official-2. To conceal the bribe payments, TELEFÓNICA VENEZOLANA covered the cost of the bribes by agreeing to purchase equipment from Company-A and Company-B at inflated prices, using the U.S. currency obtained in the auction.

18.     TELEFÓNICA VENEZOLANA, the defendant, knew that a significant portion of the approximately $28,870,099 would be paid as a "commission" that was intended, at least in part, for the benefit of Venezuelan government officials to influence the results of the currency auction. As a result of its corrupt payments, TELEFÓNICA VENEZOLANA was permitted to exchange and subsequently received over $110 million through the currency auction, which it used to purchase equipment from Company-A and Company-B.

19.     In furtherance of the scheme, TELEFÓNICA VENEZOLANA, the defendant, together with others, utilized and caused the use of means and instrumentalities of interstate commerce to communicate with each other and other individuals regarding the scheme. The conspirators also routed corrupt payments totaling more than $22 million into and out of correspondent bank accounts at financial institutions in New York, New York.

20. In total, in or around August 2014, the Venezuelan government awarded approximately $172,046,000 to 16 telecommunications companies as part of the currency auction. Between the two bids it corruptly orchestrated, TELEFÓNICA VENEZOLANA, the defendant, received approximately 65% of the total currency awarded in the auction. TELEFÓNICA VENEZOLANA was able to deploy those funds (less the $28,870,099 paid to Intermediary-1 through Shell Company-1) to buy network equipment from Company-A and Company-B and thereby continue providing telecommunications services to customers in Venezuela.

### Background on the 2014 Currency Auction

21. During the Relevant Period, TELEFÓNICA VENEZOLANA, the defendant, was a major provider of telecommunications services to businesses and consumers in Venezuela. To provide such services, TELEFÓNICA VENEZOLANA operated and maintained a telecommunications network throughout the country, which included towers, receivers, cables, and other infrastructure and equipment. TELEFÓNICA VENEZOLANA relied on multinational companies, primarily Company-A and Company-B, to supply the necessary equipment for its network.

22. Since in or around the mid-2000s, the Venezuelan government, through the Banco Central de Venezuela ("Central Bank of Venezuela"), has maintained strict currency controls, including fixed official exchange rates for limited quantities of bolívars, to limit capital flight and support the value of the Venezuelan bolívar.

23. Owing to the instability of the Venezuelan bolívar, Company-A and Company-B generally did not accept payment from TELEFÓNICA VENEZOLANA, the defendant, in bolívars, and instead required payment in stable currencies such as the U.S. dollar. By contrast, TELEFÓNICA VENEZOLANA overwhelmingly collected payments from its customers in

bolívars and developed significant bolívar reserves. Due to strict currency controls, however, TELEFÓNICA VENEZOLANA was unable to exchange its bolívar reserves for stable currencies. This undermined TELEFÓNICA VENEZOLANA's ability to purchase necessary equipment from Company-A and Company-B to operate and maintain its telecommunications network. Starting at least in or around the early 2010s, TELEFÓNICA VENEZOLANA's network was aging and in disrepair.

24. In or around 2013, the Venezuelan government began to sponsor currency exchanges (or "auctions") that allowed domestic companies in critical industries to apply to exchange Venezuelan bolívars for U.S. dollars at favorable rates and in significant quantities. These exchanges enabled domestic companies to import necessary goods and equipment from suppliers that would not accept payment in Venezuelan bolívars.

25. In or around 2014, the Venezuelan government held a national currency exchange auction specifically for the telecommunications industry. The auction, administered through the Central Bank of Venezuela, was called the Sistema Complementario de Administración de Divisas ("SICAD"). Although called an "auction," SICAD was in fact a selective government program through which the Venezuelan government chose: (i) which companies would receive access to foreign currency at favorable exchange rates; (ii) for which purposes or goods; and (iii) if awarded, how much currency a company would be permitted to exchange. To place a "bid" in the auction, a company had to submit an application that identified, among other things, which goods a company sought to purchase with the foreign currency, from which suppliers, using which customs codes, and at what cost. A company participating in the auction was also required to place in escrow bolívars corresponding to the cost of the goods they sought to import, at the favorable exchange rate designated by the SICAD. If successful, the Central Bank of Venezuela would wire

the awarded U.S. dollars (or other stable currency) directly to the "winning" company's suppliers and would debit corresponding amounts of escrowed bolívars from the winning company's escrowed account.

### TELEFÓNICA VENEZOLANA's Corrupt Participation in the SICAD Auction

Executive-1's Meetings with
Venezuelan Government Officials and Intermediary-1

26. In or around May 2014, shortly before the SICAD auction was publicly announced, Executive-1 was summoned to an impromptu meeting with, among others, Foreign Official-1 and Foreign Official-2. In that meeting, Foreign Official-1 and Foreign Official-2 informed Executive-1, in substance and in part, that: (i) the Venezuelan government would soon be announcing a currency auction for the telecommunications industry (*i.e.*, the SICAD auction); and (ii) TELEFÓNICA VENEZOLANA, the defendant, would only be awarded U.S dollars through the auction if it paid a "commission" on any funds awarded, implying that the commission would personally benefit Foreign Official-1 and Foreign Official-2 (the "SICAD Meeting with Foreign Officials").

27. Shortly thereafter, at a social gathering, Intermediary-1 informed Executive-1, in substance and in part, that Intermediary-1 had spoken with Foreign Official-1 about the SICAD Meeting with Foreign Officials. Intermediary-1 reiterated to Executive-1, in substance and in part, that TELEFÓNICA VENEZOLANA, the defendant, needed to pay "fees" if it wanted to succeed in the forthcoming SICAD auction. Intermediary-1 asked who TELEFÓNICA VENEZOLANA's largest suppliers were, and Executive-1 identified Company-A and Company-B.

Company-A's Participation in the Scheme at TELEFÓNICA VENEZOLANA's Direction

28. In or around May or June 2014, shortly after the encounter with Intermediary-1, Executive-1 met with Company-A Executive, Company-A Employee, and others, and stated, in

substance and in part, that the SICAD auction would soon be announced, and requested Company-A's participation in the auction for the benefit of TELEFÓNICA VENEZOLANA, the defendant. In particular, Executive-1 directed Company-A Executive and Company-A Employee to contact Intermediary-1 to facilitate Company-A's participation in the auction.

29.  Shortly thereafter, Company-A Employee contacted Intermediary-1. After several meetings between Company-A employees and Intermediary-1 and Intermediary-1's representatives, Company-A Employee provided Intermediary-1 with the necessary customs codes for the equipment that TELEFÓNICA VENEZOLANA, the defendant, planned to buy from Company-A with the SICAD auction proceeds.

30.  In or around July 2014, using their personal, U.S.-based email accounts, Company-A Executive and Company-A Employee exchanged drafts of a "consultancy agreement" between Company-A's parent company and an as-yet-unnamed counterparty, to be identified by Intermediary-1 once TELEFÓNICA VENEZOLANA, the defendant, and Company-A's "bid" in the SICAD auction was successful.

31.  In or around August 2014, Intermediary-1 informed Company-A Employee, in substance and in part, that the counterparty for the consultancy agreement would be Shell Company-1. At no time did Shell Company-1 or Intermediary-1 in fact perform any consultancy services for TELEFÓNICA VENEZOLANA, the defendant.

32.  On or about August 4, 2014, Intermediary-1 contacted Company-A Employee to relay, in substance and in part, that Company-A had been awarded "everything"—all the U.S. dollars—that it had applied for through the SICAD auction.

33.  Also on or about August 4, 2014, the Venezuelan government announced that Company-A had been awarded approximately $55,454,000 through the SICAD auction. On or

about August 6, 2014, the Central Bank of Venezuela debited approximately 609,994,000 bolívars from Company-A's bank account, as the funds that would be exchanged for the U.S. dollars awarded.

34. On or about October 27, 2014, the Central Bank of Venezuela transferred approximately $55,454,000 to Company-A's parent company through a correspondent bank located in the Southern District of New York.

35. Beginning on or about November 26, 2014, through at least on or about December 2, 2014, an affiliate of Company-A transferred a total of approximately $13,863,473, representing 25% of the $55,454,000 awarded to Company-A through the auction, to Shell Company-1's bank account in Luxembourg. Several of the transactions comprising the $13,863,473 to Shell Company-1 transited through correspondent banks located in the Southern District of New York.

36. Company-A used most of the $55,454,000 obtained from the SICAD auction as payment from TELEFÓNICA VENEZOLANA, the defendant, for network equipment. TELEFÓNICA VENEZOLANA reimbursed Company-A for the corrupt payments of $13,863,473 to Shell Company-1 by inflating the per-unit cost of the equipment that TELEFÓNICA VENEZOLANA purchased from Company-A.

<u>Company-B's Involvement in the SICAD Auction</u>

37. In or around May or June 2014, Executive-1 coordinated with representatives of Company-B to use Intermediary-1 to facilitate Company-B's participation in the upcoming SICAD auction.

38. Between in or around May 2014 and July 2014, TELEFÓNICA VENEZOLANA, the defendant, and Company-B agreed, among other things, that TELEFÓNICA VENEZOLANA

would directly participate in the SICAD auction and that the auction proceeds awarded to TELEFÓNICA VENEZOLANA would be used to purchase network equipment from Company-B.

39. In or around June and July 2014, Company-B Employee exchanged emails with Intermediary-1 and Intermediary-2 concerning, in part, TELEFÓNICA VENEZOLANA, the defendant, purchasing equipment from Company-B with the SICAD auction proceeds. Attachments to these emails indicate, in substance and in part, that Company-B's prices were inflated such that TELEFÓNICA VENEZOLANA would bear the cost of the bribes. In or around July 2014, Company-B Employee shared versions of these attachments with TELEFÓNICA VENEZOLANA employees.

40. On or about August 4, 2014, the Venezuelan government announced that TELEFÓNICA VENEZOLANA, the defendant, had been awarded approximately $60,027,000 through the auction. In or around August 2014, the Central Bank of Venezuela debited approximately 660,291,563 bolívars from TELEFÓNICA VENEZOLANA's bank account, as the funds that would be exchanged for the U.S. dollars awarded.

41. On or about August 18, 2014, TELEFÓNICA VENEZOLANA, the defendant, entered a contract with Company-C—acting on behalf of Company-B as its purported network integrator—for the purchase of network equipment. In fact, Company-C never performed any services for Company-B.

42. On or about September 3, 2014, the Central Bank of Venezuela transferred approximately $60,026,505.73 to Company-C through a correspondent bank located in the Southern District of New York.

43. On or about September 24, 2014, Company-C and Shell Company-1 entered into a purported "Commission Agreement" according to which Shell Company-1 would act as a "consultant" for the "Procurement of Communications Equipment for TELEFONICA VENEZOLANA, C.A. [the defendant]."

44. On or about September 30, 2014, Shell Company-1 issued an invoice to Company-C for "fees" for approximately $15,006,750.

45. On or about October 28, 2014, Company-C transferred approximately $15,006,626, representing 25% of the funds awarded to TELEFÓNICA VENEZOLANA, the defendant, in the SICAD auction, to Shell Company-1's bank account in Luxembourg. This transaction went through a correspondent bank located in the Southern District of New York.

46. Company-B and Company-C used the $60,027,000 in SICAD auction proceeds as payment from TELEFÓNICA VENEZOLANA, the defendant, for network equipment. TELEFÓNICA VENEZOLANA bore the cost of the $15,006,626 payment to Shell Company-1 by inflating the costs of the network equipment that TELEFÓNICA VENEZOLANA purchased from Company-B through Company-C.

### Benefits to Foreign Officials

47. During the Relevant Period, Intermediary-1, Intermediary-2, and others known and unknown, comingled the bribes related to the purchase of TELEFÓNICA VENEZOLANA's, the defendant's, telecommunications equipment with other funds and then paid for the lavish expenses of Foreign Official-1 and Foreign Official-1's family.

48. For example, beginning in or around December 2014 through at least January 2015, soon after Shell Company-1 received the payments that were intended, at least in part, as bribes,

Intermediary-1 spent more than $500,000 on a lavish vacation in Saint Barthélemy for Intermediary-1, Foreign Official-1, and members of their respective families.

49. Additionally, in or around January 2015, using some of the corrupt proceeds received through Shell Company-1, Intermediary-1 spent approximately $605,000 on luxury watches and jewelry in Saint Barthélemy, including for the benefit of Foreign Official-1 and Foreign Official-1's spouse.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Bribe a Foreign Official)

50. Paragraphs 1 through 49 of this Information are repeated and realleged as if fully set forth herein.

51. From in or around 2014 through at least 2015, in the Southern District of New York and elsewhere, TELEFÓNICA VENEZOLANA, the defendant, together with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, to violate the anti-bribery provisions of the FCPA, in violation of Title 15, United States Code, Section 78dd-1.

52. It was a part and object of the conspiracy that TELEFÓNICA VENEZOLANA, the defendant, being the agent of an issuer acting on behalf of that issuer, would and did make use of the mails and any means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to any person, while knowing that all or a portion of such money and thing of value will be offered, given, and promised, directly and indirectly, to any foreign official, to any foreign political party or official thereof, and to any candidate for foreign political office, for purposes of

(A)(i) influencing any act and decision of such foreign official in that foreign official's official capacity; (ii) inducing such foreign official to do and omit to do any act in violation of the lawful duty of such foreign official; and (iii) securing any improper advantage; and (B) inducing such foreign official to use that foreign official's influence with a foreign government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in order to assist TELEFÓNICA VENEZOLANA in obtaining and retaining business for and with, and directing business to, TELEFÓNICA VENEZOLANA and others, in violation of Title 15, United States Code, Section 78dd-1, to wit, TELEFÓNICA VENEZOLANA and others agreed to pay Shell Company-1, Intermediary-1, and others known and unknown, approximately 25% of any U.S. currency awarded in the SICAD auction in order to influence and induce Venezuelan officials to ensure successful bids for a total of $115,481,000 in the SICAD auction, in order to assist TELEFÓNICA VENEZOLANA in obtaining and retaining business for, and directing business to, TELEFÓNICA VENEZOLANA and others.

### Overt Acts

53.   In furtherance of the conspiracy and to achieve the object thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of New York and elsewhere, at least one of the following overt acts, among others:

    a.   On or about October 27, 2014, the Central Bank of Venezuela transferred approximately $55,454,000 to Company-A's parent company through a correspondent bank located in the Southern District of New York.

    b.   Beginning on or about November 26, 2014, through at least on or about December 2, 2014, an affiliate of Company-A transferred a total of approximately $13,863,473, representing 25% of the $55,454,000 awarded to Company-A through the auction, to Shell

Company-1's bank account in Luxembourg. Several of the transactions comprising the $13,863,473 to Shell Company-1 transited through correspondent banks located in the Southern District of New York.

c. On or about September 3, 2014, the Central Bank of Venezuela transferred approximately $60,026,505.73 to Company-C through a correspondent bank located in the Southern District of New York.

d. On or about October 28, 2014, Company-C transferred approximately $15,006,626, representing 25% of the funds awarded to TELEFÓNICA VENEZOLANA in the SICAD auction, to Shell Company-1's bank account in Luxembourg. This transaction transited through a correspondent bank located in the Southern District of New York.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

54. As a result of committing the offense alleged in Count One of this Information, TELEFÓNICA VENEZOLANA, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

55. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has bene place beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property, which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21 United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).)

GLENN S. LEON
Chief, Fraud Section

DAMIAN WILLIAMS
United States Attorney